UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDRA WILLIAMS,<br><br>Plaintiff,<br><br>v.<br><br>ANDREW SAUL, Commissioner of Social Security<br><br>Defendant. | No. 2:18-cv-2248-EFB<br><br>MEMORANDUM AND ORDER |

Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. The parties' cross-motions for summary judgment are pending. ECF Nos. 16 & 19. For the reasons discussed below, plaintiff's motion for summary judgment is granted and the Commissioner's motion is denied.

## BACKGROUND

Plaintiff filed an application for DIB, alleging that she had been disabled since April 1, 2012. Administrative Record ("AR") at 188-189. Plaintiff's application was denied initially and upon reconsideration. *Id.* at 105-110, 112-117. She appeared telephonically at a hearing before administrative law judge ("ALJ") K. Kwon. *Id.* at 43-71.

/////

1

On June 23, 2017, the ALJ issued a decision finding that plaintiff was not disabled under sections 216(i) and 223(d) of the Act.[1] *Id*. at 24-32. The ALJ made the following specific findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2. The claimant has not engaged in substantial gainful activity since November 1, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairment: bipolar disorder, anxiety disorder and personality disorder (20 CFR 404.1520(c)).

\* \* \*

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. §§ 401 *et seq*. Supplemental Security Income ("SSI") is paid to disabled persons with low income. 42 U.S.C. §§ 1382 *et seq*. Under both provisions, disability is defined, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A five-step sequential evaluation governs eligibility for benefits. *See* 20 C.F.R. §§ 423(d)(1)(a), 416.920 & 416.971-76; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The following summarizes the sequential evaluation:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
> Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
> Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. *Yuckert*, 482 U.S. at 146 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. *Id.*

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

* * *

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional specific vocational preparation (SVP) of 2 with no significant changes or regular interactions with the public for her primary duties.

* * *

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

* * *

7. The claimant was born on May 21, 1969 and was 42 years old, which is defined as a younger individual 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocation Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2012 through the date of this decision (20 CFR 404.1520(g)).

*Id.* at 24-32.

Plaintiff's request for Appeals Council review was denied on June 20, 2018, leaving the ALJ's decision as the final decision of the Commissioner. *Id.* at 1-3.

## LEGAL STANDARDS

The Commissioner's decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied. *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000);

/////

*Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive. *See Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985). Substantial evidence is more than a mere scintilla, but less than a preponderance. *Saelee v. Chater*, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

## ANALYSIS

Plaintiff presents three arguments. First, she claims that the ALJ erred in finding that she did not meet or equal the listings 12.04, 12.06, and 12.08. Second, she argues that the ALJ erred in finding her not credible with regard to her claims regarding the intensity, persistence, and limiting effects of her symptoms. Third, she claims that the ALJ erred in failing to consider the non-severe impairments stemming from her foot issues in reaching the determination that she could perform light work. The court finds plaintiff's second argument persuasive and, thus, does not reach the others.

### I. Applicable Legal Standards

As to the second argument, the ALJ discounted plaintiff's credibility. Specifically, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." AR at 30. The U.S. Court of Appeals

/////

for the Ninth Circuit has established a two-step analysis for determining how and to what extent a claimant's symptom testimony should be credited:

> First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged. In this analysis, the claimant is not required to show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom. Nor must a claimant produce objective medical evidence of the pain or fatigue itself, or the severity thereof.
>
> If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so. This is not an easy requirement to meet: The clear and convincing standard is the most demanding required in Social Security cases.

*Garrison v. Colvin*, 759 F.3d 995, 1014-15 (9th Cir. 2014) (citations and internal quotation marks omitted).

      II.     <u>Argument</u>

As noted, the ALJ determined that plaintiff's impairments could be expected to cause the alleged symptoms. She discounted plaintiff's testimony as to subjective symptoms reasoning, *inter alia*:

> [T]he claimant has not generally received the type of medical treatment one would expect for a disabled individual. The medical record demonstrates that the claimant's impairments have been treated conservatively with medication management, minimal therapy and no in-patient or emergency psychological treatment. The claimant was prescribed medications for her impairments, with no side effects. The record also demonstrated many instances of the claimant doing well, with mostly normal exam findings. Furthermore, the progress notes failed to corroborate the claimant's allegations of chronic forgetfulness and staying in bed on a regular basis. Additionally, while the claimant experienced migraines, the record showed no ongoing reports of symptoms from 2012 to 2014, with botox helping her symptoms.

AR at 29-30. Additionally, in discounting plaintiff's testimony, the ALJ stated that she was influenced by plaintiff's "generally unpersuasive presentation and demeanor while testifying at the hearing." *Id.* at 30. She did not elaborate or point to specific portions of the hearing transcript where this was evident. Elsewhere in the decision, however, the ALJ described

5

plaintiff's presentation at the hearing as "histrionic" and noted that plaintiff had "many complaints." *Id.* at 29. But, again, the ALJ failed to provide any examples of this with specific references to the record and did not articulate specific, clear and convincing reasons for discounting plaintiff's subjective testimony.

         A.    <u>"Conservative" Treatment</u>

First, the assertion that plaintiff's treatment for her mental health issues can, in any reasonable way, be termed "conservative" is not supported by the record Rather, the medical records reflect that plaintiff sought consistent treatment and prescribed medication for depression, anxiety, and bipolar disorder from 2012 through 2017:[2]

         i.    <u>2012</u>

On April 26, 2012, plaintiff presented to Dr. Edward Gaston and was diagnosed with major depressive disorder, recurrent. AR at 1741. Dr. Gaston authorized a prescription for Xanax. *Id.* In October of 2012, a different provider – Dr. Michael Bartos – diagnosed plaintiff with generalized anxiety disorder and bipolar disorder II. *Id.* at 455. He renewed prescriptions for Geodon, Xanax, and prescribed Propranolol for the first time. *Id.* at 455-56.

         ii.    <u>2013</u>

Plaintiff continued to see Dr. Bartos and receive medication[3] for her mental health issues in 2013. *Id.* at 453-54. In late 2013, she saw a different provider – Dr. Roobal Sekhon – who noted that plaintiff had "been on multiple medications in the past." *Id.* at 449. Dr. Sekhon continued prescription of plaintiff's cocktail of medications, with the intention of ultimately substituting "SSRI"[4] for Xanax. *Id.*

/////

---

[2] The medical records submitted in this case are voluminous and the court finds it unnecessary to recount every psychiatric visit described therein. Instead, it will describe enough of the provider encounters to provide a holistic view of plaintiff's psychiatric treatment.

[3] The court notes that, at a May 14, 2013 visit with plaintiff, Dr. Bartos noted that "[plaintiff] is on a *complex* combination of medications." AR at 453 (emphasis added).

[4] The court understands SSRI to stand for "Selective Serotonin Reuptake Inhibitor" – a class of antidepressants.

6

###### iii. 2014

Plaintiff saw Dr. Sekhon again in January of 2014. *Id.* at 448. He described her affect as anxious and, initially, "quite distressed." *Id.* He discontinued her Adderall, lowered her Xanax, and prescribed Seroquel for the first time. *Id.*

In February of 2014, plaintiff advised Dr. Sekhon that the Seroquel had caused her to suffer a seizure. *Id.* at 447. Her communication with Dr. Sekhon in February was apparently by telephone insofar as the provider noted that "when [plaintiff was] asked to come to the appointment, she states that she is too anxious to leave the house." *Id.*

###### iv. 2015

Plaintiff made an emergency room visit in January of 2015.[5] *Id.* at 530. She described passing out and stated that she was uncertain whether she experienced a panic attack. *Id.* Plaintiff was diagnosed with syncopal episodes and depression. *Id.* at 531.

###### v. 2016

Plaintiff was able to resume treatment with Dr. Gaston in April of 2016. Dr. Gaston diagnosed her with "major depressive disorder, recurrent episode, moderate." *Id.* at 1644. He noted that she was currently taking the following psychotropic medications: Paoxetine, Geodon, Clonazepam, Lamotrigine, Gabapentin, and amphetamine salts. *Id.* at 1645. Dr. Gaston discontinued Gabapentin, but directed her to continue the other medications. *Id.* at 1646.

In August of 2016, plaintiff had a telephonic appointment with Dr. Gaston. She noted that she was currently in a good mood, but had had 4 or 5 days in the last month during which she had become so depressed that she had suicidal thoughts. *Id.* at 1658. Dr. Gaston assessed that she suffered from a "fluctuating clinical course" and that she might benefit from a case manager. *Id.* at 1659.

In October of 2016, Dr. Gaston noted that plaintiff continued to be "profoundly depressed" and that she slept twenty-hours a day. *Id.* at 1666. He emphasized that "she sees patterns on people or animals like a bird, or somebody walking by, but these objects don't exist."

---

[5] Charts for this emergency room visit reference a previous emergency room visit in September 2014 when plaintiff "passed out." AR at 530.

*Id.* at 1667. The records state that, by that time, plaintiff had had trial of no less than *sixteen* different psychotropic medications. *Id.* Dr. Gaston increased the dosage of plaintiff's amphetamine salts and recommended that she apply for disability. *Id.* at 1668.

### vi. 2017

In January of 2017, plaintiff advised Dr. Gaston that she had two to three good days per week, but was still limited by her psychiatric conditions. *Id.* at 1686. She no longer cooked because she was easily distractible and could forget to turn the stove off. *Id.* She was able to pick her children up from school. *Id.* at 1687. Disturbingly, she reported that she continued to hear "little voices" which advised her, among other things, to attempt suicide. *Id.* at 1686. Plaintiff and Dr. Gaston agreed to taper her Paxil prescription because she was experiencing a loss of interest in sex. *Id.* at 1687.

In February of 2017, plaintiff phoned Dr. Gaston and told him that discontinuing Paxil had adversely affected her mood, causing her to become short tempered and more depressed. *Id.* at 1694. Patient and provider agreed that Paxil should be resumed. *Id.* Dr. Gaston revised plaintiff's diagnoses to "recurrent major depression with psychotic and anxious features." *Id.*

### vii. Overall Analysis

The medical records, viewed holistically, demonstrated that plaintiff had consistent, complex and aggressive treatment for her psychiatric conditions. Her providers managed an intricate cocktail of psychotropic medications over the course of years in their attempts ameliorate her symptoms. Other courts have routinely recognized similar treatment regimes as non-conservative. *See, e.g. Matthews v. Astrue,* 2012 U.S. Dist. LEXIS 47903, 2012 WL 1144423, at *9 (C.D. Cal. April 4, 2012) ("Here, however, Plaintiff has been taking psychotropic medication and receiving outpatient care since 2005. Claimant does not have to undergo inpatient hospitalization to be disabled."); *Mason v. Colvin*, 2013 U.S. Dist. LEXIS 133727, 2013 WL 5278932, at *6 (E.D. Cal. Sept. 18, 2013) (treatment deemed non-conservative where claimant was prescribed antidepressants and anti-psychotic medications for the better part of two years).

/////

/////

1 And, as plaintiff points out, other than the prescription of medication – which is obviously present in the record – there are few, if any, other viable treatments for her mental health issues. Thus, beyond hospitalization or additional therapy (which the record indicates plaintiff's insurance would not cover, *see* AR at 453), it is difficult to conceive of how her providers could have done more.

### B. Normal Findings

The ALJ discounted plaintiff's testimony after finding that "[t]he record also demonstrated many instances of the claimant doing well, with mostly normal findings." AR at 29. But, as noted in the foregoing section, plaintiff spent years seeking help for her mental health issues and, as late as 2017, still suffered from major depression. *Id.* at 1694. "[T]he treatment records must be viewed in light of the overall diagnostic record." *Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014). The overall record here does not reflect that plaintiff's mental health was "mostly normal" during the relevant period.

Even the dates identified as normal by the ALJ are accompanied by severe psychiatric issues. The ALJ cites an August 23, 2016 encounter with Dr. Gaston at which plaintiff sated that her mood was "the best it's been in a long time" and that her depression was "pretty good." AR at 1658. At that same encounter, however, plaintiff reported that she had four or five bad days per month during which she experienced powerful suicidal thoughts. *Id.* Dr. Gaston opined that her clinical course was "fluctuating" and that she would benefit from a case manager. *Id.* at 1659. The ALJ also cites an August 30, 2016 finding from another Kaiser provider, not Dr. Gaston, who noted that plaintiff's "major depression/anxiety/bipolar disorder appear stable." *Id.* at 1222. But that same report noted that plaintiff had been fatigued for two weeks, and that the condition was worsening. *Id.* And, as noted *supra*, in October of 2016, Dr. Gaston noted that plaintiff continued to be "profoundly depressed." *Id.* at 1666.

### C. Chronic Forgetfulness and Staying in Bed

The ALJ also found that the progress notes "failed to corroborate the claimant's allegations of chronic forgetfulness and staying in bed on a regular basis." *Id.* at 29-30. Yet, perplexingly, the progress notes mention both. *See Id.* at 1666 ("[Plaintiff] is 20 hours a day . . .

9

sleeping or watching TV."); 1686 (noting that plaintiff no longer cooked due to forgetfulness in turning off the stove, noting that plaintiff has only 2-3 days a week where she is "up out of bed and doing stuff").

### D. Plaintiff's Demeanor at the Telephonic Hearing

Finally, the ALJ noted that plaintiff's "unpersuasive presentation" at the hearing contributed to the credibility finding. The ALJ never explains how plaintiff was unpersuasive or offers any citation to the transcript. Elsewhere in the opinion she refers to plaintiff as "histrionic" and possessed of "many complaints." AR at 29. These descriptors shed scant light on the ALJ's findings. Further, a person manifesting as having "many complaints" and being "histrionic" are hardly surprising with the diagnosis and medical findings of bipolar disorder that are described and recounted at length in the medical records. The ALJ's observations based on plaintiff's demeanor are not, standing alone, sufficient to provide clear and convincing reasons for disregarding her testimony. *See, e.g., Overton v. Berryhill*, No. 3:17-cv-00025-BEN-BLM, 2018 U.S. Dist. LEXIS 50982 , * 23-24, 2018 WL 156315 (S.D. Cal., Mar. 24, 2018) ("While an ALJ can include personal observations of a plaintiff during a hearing, a negative credibility determination based on those observations is proper only if it is supported by other evidence.").

## CONCLUSION

The only question that remains is whether to remand for payment of benefits or additional proceedings. "The decision whether to remand a case for additional evidence, or simply to award benefits is within the discretion of the court." *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987). A court should remand for further administrative proceedings, however, unless it concludes that such proceedings would not serve a useful purpose. *Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2016). The court cannot say that additional proceedings would have no utility in the present case. In particular, the generation of additional medical evidence in the intervening years may prove enlightening. *See Treichler v. Comm'r of Soc. Sec.*, 775 F.3d 1090, 1101 (9th Cir. 2014) (additional proceedings have utility where "there is a need to resolve conflicts and ambiguities, . . . or the presentation of further evidence . . . may well prove enlightening in light of the passage of time.") (internal quotations and quotation marks omitted).

Based on the foregoing, it is hereby ORDERED that:

1. Plaintiff's motion for summary judgment (ECF No. 16) is GRANTED;

2. The Commissioner's cross-motion for summary judgment (ECF No. 19) is DENIED;

3. This matter is REMANDED for additional administrative proceedings; and

4. The clerk is directed to enter judgment in plaintiff's favor and close the case.

DATED: March 18, 2020.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE